IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Eldar Z. Veliev,

        Petitioner,

      v.                         Case No. 2:12-cv-346

                                    JUDGE MICHAEL H. WATSON
Warden, Chillicothe Correctional        Magistrate Judge Kemp
Institution,

        Respondent.

## REPORT AND RECOMMENDATION

      Petitioner, a state prisoner, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on that petition, respondent's return of writ, and the exhibits attached to the return. Also before the Court is a motion for leave to amend the petition. For the reasons that follow, the Magistrate Judge RECOMMENDS that the motion for leave to amend be DENIED and petitioner's claims be DISMISSED.

## I. PROCEDURAL HISTORY

      On July 11, 2008, a Franklin County, Ohio grand jury returned a two-count indictment against petitioner and his co-defendant charging felonious assault and attempted murder. *Motion to Dismiss (Doc. 10), Exhibits 1 and 2.* Petitioner pleaded not guilty and was tried by a jury jointly with his co-defendant. *Id. , Exhibits 3 - 6.* On September 3, 2009, the jury convicted him of both charges. *Id., Exhibits 7 - 9.* On October 22, 2009, the trial judge merged petitioner's sentences and imposed a sentence of eight years on the conviction for attempted murder. *Id., Exhibits 8 and 9.*

      Petitioner timely appealed his conviction to the Court of Appeals for the Tenth Appellate District. *Motion to Dismiss, Exhibits 10 and 11.* He raised seven assignments of error, as follows:

1. The trial court improperly excluded defense witnesses under Evidence Rules 404 and 608 that rebutted the State's characterizations of an alleged victims [sic] good character, thereby violating Appellant's right to present a meaningful defense as guaranteed by the Compulsory Process Clause of the Sixth Amendment, the Due Process clause of the Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. (Tr. Trn. Vol., IV, Pg. 186-187)

2. The trial court improperly quashed Appellant's subpoena of an [sic] non-confidential criminal investigation that rebutted the State's characterizations of an alleged victims [sic] good character, thereby violating Appellant's right to present a full defense as guaranteed by the Compulsory Process Clause of the Sixth Amendment, the Due Process clause of the Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. (Tr. Trn. Vol. I, Pg. 86)

3. The trial court improperly quashed Appellant's subpoena of an [sic] non-confidential criminal investigation that rebutted the State's characterizations of an alleged victims [sic] good character, thereby violating the Due Process clause of the Fourteenth Amendment and comparable provisions of the Ohio Constitution. (Tr. Trn. Vol. I, Pg. 86)

4. The trial court improperly limited Appellant's cross-examination and implied in the presence of the jury that Appellant should testify at trial, thereby violating Appellant's Fifth Amendment right to remain silent, Sixth Amendment right to a trial by jury and Sixth Amendment right to confront his accusers, the Due Process clause of the Fourteenth Amendment and comparable provisions of the Ohio Constitution (Tr. Trn. Vol., IV, Pg. 82)

5. The court improperly excluded evidence that rebutted Arut Koulian's assertions that his motive for leaving town was due to threats fromAmbartsoumov's family with evidence of his financial difficulty, thereby violating Appellant's right to present a meaningful defense as guaranteed by the Compulsory Process Clause of the Sixth Amendment, the Due Process clause of the Fourteenth Amendment to the United States Constitution, and Article I, Section 10 of the Ohio Constitution. (Tr. Trn. Vol. I, Pg. 225-226)

-2-

6. The trial court erred in overruling Appellant's motion for a mistrial when the state elicited testimony from two Columbus Police Officers that Appellant's co-defendant did not tell them how he cut his hand and that he did not tell them he was a victim of an assault and thus commenting on his constitutional right to remain silent, thereby violating Appellant's Fifth Amendment right to remain silent, and his right to Due Process under the Fourteenth Amendment. (Tr. Trn. Vol. II, Pg.13)

7. The trial court violated Appellant's right to Due Process as Guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution by entering verdicts of Guilty, as the jury's verdict was against the manifest weight of the evidence. (Tr. Trn. Vol. V, Pg. 132)

*Motion to Dismiss, Exhibits 13 and 14.* In a decision dated December 23, 2010, the Tenth District Court of Appeals overruled the assignments of error and affirmed Petitioner's conviction. *State v. Veliev*, 2010 WL 5449848 (Franklin Co. App. December 23, 2010).

On February 2, 2011, Petitioner, represented by new counsel, filed an appeal with the Ohio Supreme Court. *Motion to Dismiss, Exhibit 18.* In his memorandum in support of jurisdiction, he raised eight propositions of law, as follows:

1. Appellant's right to present a defense was violated when the trial court refused to permit the defense to refute assertions by one of the State's key witnesses that he was an upstanding community leader and had never been involved in illicit activity.

2. Appellant's right to present a defense was violated when the trial court quashed Appellant's subpoena of a non-confidential criminal investigation that rebutted the State's characterizations of a witness' good character.

3. When the Appellant's subpoena of a non-confidential criminal investigation rebutting the State's characterizations of a witness' good character was quashed by the trial court it effectively denied Appellant the opportunity to prove that the Prosecution violated its disclosure duties under Crim. R.16 and *Brady v. Maryland*, 373 U.S. 83 (1963).

4.  An accused has the right to test the reliability of witnesses through cross-examination on all relevant matters.

5.  When a defendant chooses not to testify, the Fifth Amendment prohibits the trial judge from making adverse comments about the defendant's decision to not testify.  *Griffin v. California*, 380 U.S. 609, 614-15 (1965), followed.

6.  Appellant's right to present a defense was violated when the trial court refuse to permit the defendant to put on evidence concerning the State's witness' motive for fleeing the country.

7.  A defendant's post arrest silence cannot be used as substantive evidence against him at trial. *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37 (1966), followed.

8.  In reviewing claims of whether a verdict is against the manifest weight of the evidence it is not relevant whether the jury is in the best position to consider inconsistencies in testimony because an appellate court sits as the thirteenth juror and may disagree with the fact-finder's resolution of the conflicting testimony. *State v.Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶25 followed .

*Id., Exhibit 19.*  On April 20, 2011, the Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question. *Id., Exhibit 21.*

On March 17, 2011, Petitioner filed an application to reopen his direct appeal pursuant to Appellate Rule 26(B).  In his application, he alleged that his appellate counsel was ineffective for failing to raise the following assignments of error:

1.  Defense counsel rendered ineffective assistance when they failed to object to the admission of evidence concerning victim Tigran Safaryan's character during the prosecution's case-in-chief where the defendant had not yet put on his case or otherwise put on any evidence concerning the victim's character in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp.37-41).

2.  The trial court erred when it allowed victim Safaryan to testify over objection why he was "cautious" of defendant Ambartsoumov in

-4-

violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, p. 71).

3. The trial court erred when it permitted Safaryan's cousin, Sabina Shvets, to testify over objection as to the reasons why Safaryan was cautious of Ambartsoumov in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 3, pp. 77-95).

4. The trial court erred to the prejudice of the defendants when it used the wrong standard in deciding the discoverability of materials sought by the defense under Crim. R.16(B)(1)(f) in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp. 100-101).

5. Defense counsel rendered ineffective assistance when they failed to object to the admission of evidence of the victim Arut Khoulian's character during the prosecution's case in chief where the defendant had not yet put on his case or otherwise put on any evidence concerning the victim's character in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp.119-122).

6. Defense counsel rendered ineffective assistance when they failed to cross-examine Tigran Safaryan about inconsistent statements he made to medical personnel concerning how the confrontation started that resulted in his wound in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp.105-113).

7. The trial court erred when it overruled the defense motion for a continuance to subpoena Tigran Safaryan in order to question him about statement he made to emergency room personnel in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 4, p. 29).

8. The trial court erred in refusing to allow the defense to play a video tape recording of Ambartsoumov's statement to the police in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 4, p. 56).

9. Trial counsel rendered ineffective assistance when they failed to introduce during cross-examination of Detective Siniff portions of the interview with Ambartsoumov in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 2, pp.160-180).

10. Trial counsel rendered ineffective assistance when they failed to introduce, pursuant to Evid.R.801(D)(1)(b), Ambartsoumov's statement to the Detective Siniff indicating how he was cut the night of the incident in order to rebut the prosecution's charge against Ambartsoumov that he never explained to the police how he got cut during the incident in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 4, p.56).

On January 24, 2012, the Tenth District Court of Appeals denied the application to re-open the appeal. *Motion to Dismiss*, *Exhibits 25 and 26*. Petitioner appealed this decision to the Ohio Supreme Court. *Id.*, *Exhibit 28*. On May 9, 2012, the Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question. *Id.*, *Exhibit 31*.

On April 18, 2012, Petitioner filed a motion for leave to file a delayed motion for a new trial in the Common Pleas Court of Franklin County, Ohio. *Motion to Dismiss*, *Exhibit 32*. On August 10, 2012, Petitioner filed an amended motion. *Return of Writ (Doc. 18)*, *Exhibit 35*. On September 12, 2012, the trial court denied the motion, as amended, as untimely. *Id.*, *Exhibit 37*. On October 10, 2012, Petitioner filed an appeal with the Tenth District Court of Appeals challenging the trial court's denial of this motion. *Id.*, *Exhibits 39 and 42*. On July 11, 2013, the Court of Appeals affirmed the

denial of leave to file a delayed motion for a new trial.  (Doc. 19).

Also on April 18, 2012, Petitioner, through counsel, timely presented his petition for a writ of habeas corpus to this Court.  In his petition, he raised the following grounds for relief, stated here exactly as they appear in the petition:

Ground One:

Eldar Z. Veliev's right to present a defense was violated when the trial court refused to permit the defense to refute assertions by one of the State's key witnesses that he was an upstanding community leader and had never been involved in illicit activity.  The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Two:

Eldar Z. Veliev's right to present a defense was violated when the trial court quashed his subpoena of records concerning a non-confidential criminal investigation which rebutted the State's characterizations of a witness' good character.  The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Three:

When the subpoena of a non-confidential criminal investigation rebutting the State's characterizations of a witness' good character was quashed by the trial court it effectively denied Ambartsoumov the opportunity to prove that the Prosecution violated its disclosure duties under *Brady v. Maryland*, 373 U.S. 83 (1963).  The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Four:

Eldar Z. Veliev was denied the right to test the reliability of witnesses through cross-examination on all relevant matters.  The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Five:

Eldar Z. Veliev chose not to testify at trial and the trial judge made adverse comments about his decision not to testify.  The state court adjudication of this claim was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Six:

Eldar Z. Veliev's right to present a defense was violated when the trial court refused to permit the defendant to put on evidence concerning the State's witness' motive for fleeing the country.  The state court resolution of this ground was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Seven:

Eldar Z. Veliev was denied due process and a fair trial when his co-defendant's post arrest silence was used as substantive evidence against him at trial.  The state court adjudication of this claim was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Eight:

Eldar Z. Veliev's right to present a defense was violated when the trial refused to permit defendant to put on evidence concerning the State's witness' motive for fleeing the country.  The state court adjudication of this claim was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Nine:

Eldar Z. Veliev was denied effective assistance of appellate counsel when his counsel failed to present the following issues on direct appeal:

      1:      Defense Counsel rendered ineffective assistance when they failed to object to the admission of evidence concerning victim Tigran Safaryan's character during the prosecution's case-in-chief where the defendant had not yet put on his case or otherwise put on any evidence concerning the victim's character in violation of defendant's rights under

the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp. 37-41).

2.      The trial court erred when it allowed victim Safaryan to testify over objection why he was "cautious" of defendant Ambartsoumov in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, p. 71).

3.      The trial court erred when it permitted Safaryan's cousin, Sabina Shvets, to testify over objection as to the reasons why Safaryan was cautious of Ambartsoumov in violation of defendants' rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution (TR. Vol. 3, pp. 77-95).

4.      The trial court erred to the prejudice of the defendants when it used the wrong standard in deciding the discoverability of materials sought by the defense under Crim.R. 16(B)(1)(f) in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp. 100-101).

5.      Defense Counsel rendered ineffective assistance when they failed to object to the admission of evidence of the victim Arut Khoulian's character during the prosecution's case in chief where the defedant had not yet put on his case or otherwise any evidence concerning the victim's character in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 1, pp. 119-122).

6.      Defense counsel rendered ineffective assistance when they failed to cross-examine Tigran Safaryan about inconsistent statements he made to medical personnel concerning how the confrontation started that resulted in his wound in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (TR. Vol. 1, pp. 105-113).

7.      The trial court erred when it overruled the defense motion

-9-

for a continuance to subpoena Tigran Safaryan in order to question him about statement he made to emergency room personnel in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 4, p. 29).

      8.     The trial court erred in refusing to allow the defense to play a video tape recording of Ambartsoumov's statement to the police in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 4, p. 56).

      9.     Trial counsel rendered ineffective assistance when they failed to introduce during cross-examination of Detective Siniff portions of his interview with Ambartsoumov in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 2, pp. 160-180).

      10.     Trial counsel rendered ineffective assistance when they failed to introduce, pursuant to Evid.R. 801(D)(1)(b), Ambartsoumov's statement to the Detective Siniff indicating how he was cut the night of the incident in order to rebut the prosecution's charge against Ambartsoumov that he never explained t the police how he got cut during the incident in violation of defendant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution. (TR. Vol. 4, p. 56).

The state court adjudication of this claim was an unreasonable application of or contrary to United States Supreme Court precedent.

Ground Ten:

      Eldar Z. Veliev was denied effective assistance of counsel when his counsel failed to investigate and present testimonial evidence that Alex Nercessian cut Arut Khoulian's neck and Armen Stepanyan cut Tigran Safaryan's arm.

Respondent moved to dismiss the petition because Petitioner had failed to exhaust state court remedies with respect to ground ten. (Doc. 10). On June 3, 2013,

-10-

Petitioner amended his petition, omitting ground ten.  (Doc. 14).

## II.  FACTS

The facts of the underlying offense are stated in the state court of appeals' opinion.  This is how the state court of appeals described the events which led to the filing of charges against Petitioner:

> On the evening of May 17, 2008, Safaryan and Koulian joined another friend, Alex Nercessian, at the "Hawa Russia," a Russian club/restaurant located on East Dublin Granville Road, Columbus. Appellant, an employee of a body shop owned by Ambartsoumov, was at the restaurant that evening with Ambartsoumov.
>
> Safaryan testified on behalf of the state and gave the following account. After arriving at the restaurant that evening, Safaryan received a phone call, and he went outside to a patio area to continue the conversation. As Safaryan finished his call, Ambartsoumov, appellant, and two other individuals came outside. Safaryan and Ambartsoumov were acquainted with each other. Ambartsoumov started walking toward Safaryan, and Safaryan noticed what appeared to be a knife in Ambartsoumov's hand. Safaryan said to Ambartsoumov: "[W]hat do you say to my cousin." (Tr. Vol.I, 50 .) Ambartsoumov then slashed at Safaryan with a knife. Safaryan attempted to block the attack, but he received a ten-inch knife wound to his right arm. Just before the attack, Safaryan heard Ambartsoumov say "kill" in Russian. (Tr. Vol.I, 80.) After being cut, Safaryan punched Ambartsoumov and attempted to get away from the patio area.
>
> When Ambartsoumov first came outside the restaurant, appellant was walking directly behind him. Safaryan's friend, Koulian, was also outside at the time, standing in the vicinity of appellant. Safaryan observed a silver knife in appellant's hand, and then he saw "blood all over" Koulian's shirt. (Tr. Vol.I, 55.)
>
> Police officers were dispatched to the restaurant, and when Ambartsoumov refused to get on his knees, the officers subdued him with a Taser gun. At the time, Ambartsoumov was speaking in Russian, threatening to kill Safaryan and his family. At trial, Safaryan identified Ambartsoumov as his assailant.
>
> Koulian gave the following account of the events that evening. Shortly after arriving at the restaurant with Safaryan, Koulian went outside to

smoke. Koulian heard a commotion and he observed Ambartsoumov holding a knife in his hand, threatening Safaryan. Ambartsoumov then struck Safaryan on the right arm with the knife. Safaryan punched Ambartsoumov and retreated. Koulian observed Ambartsoumov get to his feet with the knife in his hand.

Koulian attempted to back away from the scene, but another individual, later identified as appellant, was "coming towards" him. (Tr. Vol.I, 129.) Koulian raised his arms and said, "hey, stop." (Tr. Vol.I, 129.) Koulian observed "something that resembled a medical scalpel" in appellant's hand. (Tr. Vol.I, 129.) Koulian took a step backward and appellant shoved Koulian in the shoulder area; appellant then pulled his hand back, and Koulian immediately "saw blood coming down like crazy from my neck." (Tr. Vol.I, 130.) Someone pulled Koulian away, and Nercessian came outside to assist him. Koulian later learned that his assailant was named "Eldar." At trial, Koulian identified appellant as the individual who assaulted him. Koulian suffered an eight-inch wound to his neck, and he experiences numbness in the area of the wound; doctors informed him that some nerve endings had been damaged.

 Following the incident, Koulian testified before a grand jury proceeding, and he subsequently received a threatening phone call in which the caller stated: "You will die tonight." (Tr. Vol.I, 177.) Koulian immediately closed his jewelry business and left the Columbus area. He subsequently obtained an airline flight to Russia after receiving paperwork from the Russian consulate in California.

Alexander Dashovsky, who was attending a birthday party at the Hawa Russia restaurant on the night of the incident, gave the following testimony. During the evening, Safaryan got up from his table and went outside to smoke. Shortly thereafter, Ambartsoumov got up from his table and went to the restroom. Dashovsky then went outside to smoke; as he was walking toward the door, Dashovsky observed Ambartsoumov pass a knife to appellant. Dashovsky, who was acquainted with Ambartsoumov, recognized the knife from when Ambartsoumov "used to cut hair." (Tr. Vol.II, 86.) Dashovsky walked outside and observed Safaryan walking away, "holding his arm." (Tr. Vol.II, 87.) Safaryan was bleeding; his arm was "severely cut down to the veins." (Tr. Vol.II, 87.)

Dashovsky then heard Koulian yelling "I got cut, I got cut." (Tr. Vol.II, 87.) Koulian's neck had been cut, and Dashovsky ran inside the restaurant to

get some towels and blankets. Dashovsky turned his attention to Safaryan's wounds because he "didn't think Arut [Koulian] would make it." (Tr. Vol.II, 88.) Ambartsoumov and appellant went back inside the restaurant. Dashovsky testified he did not observe either appellant or Ambartsoumov being hit or punched during the incident. At trial, the state played a recording of a 911 call placed by Dashovsky that evening in which he told the dispatcher that one of the assailants was of "Armenian descent, first name Garri." (Tr. Vol.II, 96.)

Dmitry Semikin testified he was standing outside the restaurant that evening when he heard screams and observed between 10 to 15 individuals near the restaurant entrance. Semikin observed a knife in Ambartsoumov's hand, and Safaryan's "arm was already cut and he was holding it with another hand." (Tr. Vol.III, 19.) Semikin saw Safaryan punch Ambartsoumov. He also observed Koulian "holding his neck, which was bleeding." (Tr. Vol.III, 21.) Appellant was standing across from Koulian at the time. As Ambartsoumov was taken into custody by police, he was making "[h]is usual threats, that he will kill everybody and he will avenge everybody." (Tr. Vol.III, 25.)

 Columbus Police Officer Matthew Ewing accompanied Ambartsoumov in a medical vehicle to the hospital; the officer observed that he was bleeding from a cut to his right hand, near the thumb. Columbus Police Detective Glenn Siniff spoke with Safaryan later that night at the hospital. The next day, Detective Siniff interviewed Koulian, who named the individual that cut his throat. After being shown a photo array, Koulian picked out appellant's picture from the array. The detective also spoke with Semikin, who identified appellant as being involved in the incident.

 Sabina Shvets, a cousin of Safaryan, testified that she was at a nightclub in 2007 and had a conversation with Ambartsoumov. After Shvets told Ambartsoumov that she was related to Safaryan, "he got mad and he started saying that he hates him, that he's going to kill his son, his family." (Tr. Vol.III, 82.) Ambartsoumov once told Shvets: "I'm the king of the city, and if I don't like someone, I'm going to kill the person." (Tr. Vol.III, 84.)

 Aydin Gasanov, Ambartsoumov's father-in-law, was called as a witness by the defense. Gasanov was at the Hawa Russia on May 17, 2008, and he gave the following account of the events. During the evening, Ambartsoumov and appellant got up from their table; a short time later, Safaryan, Koulian, Nercessian, and several other individuals went outside

to smoke. Later, Gasanov heard screaming, and he went outside and observed appellant lying on the floor, while Ambartsoumov was on his knees attempting to get up. Gasanov testified that nine or ten individuals "were beating Garri and Eldar with their feet." (Tr. Vol.IV, 35–36.) Gasanov attempted to stop the fight, and appellant and Ambartsoumov eventually went back inside the restaurant.

Ambartsoumov testified on his own behalf. Ambartsoumov, who graduated from National Beauty Academy after moving to the United States from Azerbaijan, currently owns a body shop. He has known Safaryan for 15 years, and he has known appellant for 12 years. On May 17, 2008, Ambartsoumov was having dinner at the Hawa Russia restaurant with some friends and relatives. During the evening, Ambartsoumov went to the restroom, and then went outside with appellant to smoke.

Ambartsoumov testified that Safaryan, Koulian, and Nercessian "started coming closer." (Tr. Vol.IV, 68.) As the men approached, Safaryan told Ambartsoumov that he wanted to talk to him. Ambartsoumov told Safaryan that he was with his family and that he did not "want any problems." (Tr. Vol.IV, 69.) Ambartsoumov testified that Safaryan then "smacked me twice. And I walked back and tried to go." (Tr. Vol.IV, 69.) After being hit twice, Ambartsoumov "hit him back." (Tr. Vol.IV, 69.) Safaryan then hit Ambartsoumov a third time, causing him to fall down. When Ambartsoumov fell, he "tried to push this guy. I get * * * cut very badly." (Tr. Vol.IV, 70.) Ambartsoumov's father-inlaw came outside, and Ambartsoumov then went back inside the restaurant. When police officers arrived, Ambartsoumov refused an officer's order to get on his knees. He told the officer to "cuff me" instead. (Tr. Vol.IV, 72.) The officer then used a Taser gun on him. Ambartsoumov denied having a knife that evening, and he denied observing a knife in appellant's hand.

Dimitri Zubrich was at the Hawa Russia restaurant that evening, and he testified that "everybody knows that Tigran [Safaryan] doesn't like Garri [Ambartsoumov] and has been trying to get him for something." (Tr. Vol.IV, 151.) During the evening, Ambartsoumov and appellant went outside to smoke, and individuals seated at Safaryan's table then got up and also went outside. Zubrich observed Safaryan hit Ambartsoumov; Zubrich did not want to get involved, so he went back inside the restaurant. A short time later, Ambartsoumov, appellant, and Ambartsoumov's father-in-law came back inside the restaurant and

-14-

Zubrich heard screams. Five or six individuals came running inside the front door of the restaurant and headed toward the back kitchen door.

*State v. Veliev*, supra, at **1-4.

### III. PROCEDURAL DEFAULT

### Grounds Four and Five

Petitioner's fourth and fifth grounds for relief contend that the trial court improperly limited his cross-examination and implied in the presence of the jury that he should testify.  These grounds were raised as one on direct appeal.  Although in his habeas petition Petitioner characterizes his fourth ground broadly as a denial of his "right to test the reliability of witnesses through cross-examination on all relevant matters," on direct appeal the focus of this claim was more limited.  On direct appeal, Petitioner raised this issue as a Sixth Amendment Confrontation Clause claim.  Specifically, he framed the issue as directed to the trial court's limiting of his cross-examination of his co-defendant by declining to allow a demonstration of the altercation.  As explained in his appellate brief, "[t]his demonstration concerned the heart of Appellant's defense - he did not cut anyone and was attacked."  *Motion to Dismiss Exhibit 13, p. 21.*  With respect to his fifth ground for relief here, Petitioner presented this issue on direct appeal as relating to the trial court's "improper[] suggest[ion] that Appellant should take the stand in the presence of the jury."  *Id.*, p. 19.

The Court's review of the record concludes that these claims are based on the following exchange during the trial:

[Counsel for Veliev]: Judge, if I may ask this witness to come out and demonstrate what happened out on the patio that night from his point of view.

THE COURT: Well, Mr. Shamansky is his lawyer.  He didn't do it, so I'm not going to allow it at this point.  You can do it with your own client if you want to.  But you don't represent this client.  I'm not going to have any demonstrations at this point.  Thank you.

-15-

Tr.Vol. IV, pp. 81-82.

Respondent contends that these grounds are procedurally defaulted because of Petitioner's failure to raise a contemporaneous objection. Alternatively, Respondent argues that these claims fail on their merits.

### A. Legal Standard

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971). But if, because of a procedural default, the Petitioner can no longer present his claims to the state courts, then he has also waived those claims for purposes of federal habeas corpus review, unless he can demonstrate both cause for the procedural default, as well as actual prejudice from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the Petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court must determine that there is a state procedural rule that is applicable to the Petitioner's claim and that the Petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and

independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the Petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

### B. Analysis

Turning to the first prong—whether Petitioner failed to comply with an applicable state procedural rule—respondent argues that Petitioner failed to comply with Ohio's "contemporaneous objection rule."   A review of the transcript confirms that Petitioner made no contemporaneous objection in connection with the exchange cited above.  In Ohio, there appears to be a non-codified  contemporaneous objection rule that applies to any error that could have been avoided or corrected by the trial court if a contemporaneous objection were made.  *LeFort v. Century 21–Maitland Realty Co.*, 32 Ohio St.3d 121, 123 (Ohio 1987) ("An appellate court will not consider any error which a party complaining of a trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.") (citations omitted). The Court of Appeals has recognized this broad contemporaneous objection rule. *See, e.g., Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).

In *Hinkle v. Randle*, the Court of Appeals held that a claim for prosecutorial misconduct claim involving the prosecutor's statements in closing argument was procedurally defaulted. *Id.* at 244. The Court of Appeals noted, "[w]e have held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice." *Id.* Similarly, in *Williams v. Bagley*, 380 F.3d 932, 968 (6th Cir. 2004), the Court of Appeals applied the contemporaneous objection rule to Petitioner's failure to object to

prosecutor's impermissibly vouching for the credibility of Petitioner's accomplices during their testimony.  Here, there was no objection which could have alerted the court to any suggestion that its comments deprived Petitioner of his right not to be a witness against himself or indicated to the jury that the court expected Petitioner to testify. Had such an objection been made, it could have resulted in a curative instruction. Accordingly, Ohio's contemporaneous objection rule applied, and the first prong of the procedural default analysis is satisfied.

Second, the Court must determine whether the state courts actually enforced the state procedural sanction. "In determining whether state courts have relied on a procedural rule to bar review of a claim, we look to the last reasoned opinion of the state courts and presume that later courts enforced the bar instead of rejecting the defaulted claim on its merits." *Hinkle*, 271 F.3d at 244.  Here, the state appellate court, which issued the last reasoned opinion reviewing Petitioner's claim that his Fifth Amendment rights were violated, applied a plain error analysis:

> Appellant argues that the obvious implication from the trial court's comments is that the court believed appellant needed to take the stand. Appellant contends that the comments deprived him of his Fifth Amendment right not to be a witness against himself, and left the jury with the impression that the court expected him to testify.
>
> In addressing a similar challenge to the above comments by co-defendant Ambartsoumov, this court interpreted the trial court's response "as exercising its discretion in whether to permit demonstrative evidence," and that, "when read in context, merely stress[es] that the attorney should have his own client perform demonstrations." *Ambartsoumov* at ¶ 59. We rejected the contention that the trial court indicated "a disbelief in [co-defendant's] testimony or somehow cast doubt on his credibility." *Id*. This court also noted that no objection was made to the comments, nor did defense counsel request a limiting instruction, and we found no plain error by the trial court.
>
> Again, we view the trial court's comments as directed toward the issue of its control over the presentation of evidence, i.e., demonstrative evidence, but we do not construe those comments as implying that appellant was

required to testify. Further, the trial court instructed the jury that appellant's "choosing not to testify is not evidence, and you may draw no negative conclusion against Mr. Veliev simply because he exercised his constitutional right." (Tr. Vol.V, 97.) There is a presumption that a jury follows the instructions provided by the trial court. *State v. Sibert* (1994), 98 Ohio App.3d 412, 425, 648 N.E.2d 861, citing *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph four of the syllabus.

Finding no plain error, we overrule appellant's fourth assignment of error. *State v. Veliev*, 2010 WL 5449848, **7-8 (December 23, 2010) . Respondent argues that by applying plain error review pursuant to Criminal Rule 52(b), the state appellate court was enforcing the contemporaneous objection rule. *Hinkle* supports this argument, noting that the Court of Appeals "view[s] a state appellate court's review for plain error as the enforcement of a procedural default." 271 F.3d at 244 (citations omitted); *see also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) ("Controlling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules") (citations omitted).

The fact that the state appellate court here also noted that it "view[ed] the trial court's comments as directed toward the issue of its control over the presentation of evidence, i.e., demonstrative evidence, but [did] not construe those comments as implying that appellant was required to testify," *Veliev*, 2010 WL 5449848, *8, did not remove the procedural default. *See Conley v. Warden Chillicothe Corr. Inst.*, 505 F. App'x 501, 506 (6th Cir.2012) ("The Ohio court's alternative ruling on the merits did not remove the procedural default because 'a state court need not fear reaching the merits of a federal claim in an alternative holding,'" citing *Harris v. Reed*, 489 U.S. 255, 264 n. 10. (1989) and *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998)). The Court of Appeals in *Conley* noted that in that case "[t]he Ohio Court of Appeals found no plain error on the record and held that '[a]dditionally, appellant has not persuaded us that the comments actually constitute prosecutorial misconduct,' " and still held that the Ohio appellate court did not waive the procedural default. *Conley*, 505 F. App'x at 506. (citation omitted).

-19-

Accordingly, the state appellate court's application of plain error review satisfies the second prong of the procedural default analysis.

Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. As explained above, the Court of Appeals in *Hinkle* noted that it had "held that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice." *Hinkle*, 271 F.3d at 244. The *Williams* decision also confirmed that Ohio's contemporaneous objection rule was an adequate and independent state ground. *Williams*, 380 F.3d at 968–69.

Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the Petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985). Petitioner has not filed a traverse, and the facts he lists in his petition in support of Grounds Four and Five do not describe any cause for the default or prejudice from the alleged error. Generally speaking, "ignorance of the law and procedural requirements ... is insufficient to establish cause to excuse [a] procedural default." *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004). Furthermore, Petitioner has not preserved any argument that counsel was ineffective for failing to object to the introduction of the testimony at issue. *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986) ( "Ineffective assistance of counsel, then, is cause for a procedural default. However, we think that the exhaustion doctrine ... generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default"). Thus, the Court cannot find cause and prejudice sufficient to excuse the procedural default of Grounds Four and Five, and it will be recommended that these grounds be dismissed due to their

-20-

having been procedurally defaulted in the state courts.

Assuming, however, that either of these claims has been preserved for federal habeas reveiw, Petitioner is not entitled to relief on the merits. Turning first to his fourth ground, the limit on cross-examination relating to the demonstrative evidence, to the extent that Petitioner believes this claim arises under the Confrontation Clause of the Sixth Amendment, he has not demonstrated any violation of that clause. First, the Confrontation Clause does not encompass a defendant's right to confront non-adverse witnesses. *See Tan Van Le v. Prelesnik*, 2006 WL 2620693, *12 (W.D. Mich. Sept. 12, 2006), *citing United States v. Doddington*, 822 F.2d 818, 821 (8th Cir. 1987). Petitioner has not demonstrated that his co-defendant was an adverse witness and the record indicates that he was not. Further, while the Confrontation Clause guarantees the right to cross-examine state witnesses, the guarantee is for "'an opportunity for an effective cross examination, not cross examination that is effective in whatever way, and to whatever extent the defense might wish.'" *Miskel v.Karnes*, 397 F.3d 446, 452 (6th Cir. 2005), *quoting Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Rather, "'a trial court has discretion to limit the scope of cross-examination .... This includes the discretion to impose limits based on concerns about harassment, prejudice, confusion of the issues ... or interrogation that is repetitive or only marginally relevant.'" *Id., quoting Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000), *cert. denied*, 532 U.S. 913 (2001).

In this case, the trial court exercised control over the presentation of demonstrative evidence by Petitioner's co-defendant. In exercising this control, the trial court did not prevent defense counsel from inquiring about the incident in the absence of a demonstration. Defense counsel, however, chose not to do so. Such a strategic choice does not violate the Confrontation Clause. *Bailey v. Pitcher*, 86 Fed. Appx. 110, 114 (6th Cir. 2004). Rather, "[w]hen a state court gives the defendant an opportunity to cross-examine a witness and the defendant opts not to accept that opportunity as a matter of trial strategy, it does not offend the Confrontation Clause." *Id.* Because the trial court gave Petitioner an opportunity to cross-examine his co-defendant about the altercation,

the Court concludes that the state appellate's rejection of Petitioner's claim relating to the limitation on demonstrative evidence was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

With respect to Petitioner's fifth claim, there is no question that a trial court's direct reference to a criminal defendant's failure to testify in his own defense is a violation of the Fifth Amendment privilege against compelled self-incrimation. *Griffin v. California*, 380 U.S. 609 (1965). Similarly, indirect references to the failure to testify also can violate the Fifth Amendment. *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000). Where a trial court has indirectly commented on a defendant's failure to testify, the Court must conduct a "probing analysis" of the context of the comments. *Spalla v. Foltz*, 788 F.2d 400, 403 (6th Cir. 1986). This analysis is necessary in order to determine "'[w]hether the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *Id.,* at 404, *quoting Butler v. Rose*, 686 F.2d 1163, 1170 (6th Cir. 1982). The analysis requires consideration of several factors including, whether the remarks were isolated and extensive, whether the evidence of guilt was overwhelming, and whether curative instructions were given and when. *Id., citing Hearn v. Mintzes*, 708 F.2d 1072, 1077 (6th Cir. 1983).

As the state appellate court concluded, "the comments, when read in context, merely stress that the attorney should have his own client preform demonstrations." This Court agrees. The trial court's statements, taken in context, merely indicate the trial court's intention to preclude a demonstration of the altercation by Petitioner's co-defendant. There is no indication from the record that trial court's statements were intended to be taken by the jury as a comment on Petitioner's decision not to testify. Further, as the appellate court noted, the trial court instructed the jury specifically that Petitioner was not required to testify. Under this circumstance, the appellate court's rejection of this claim did not involve an unreasonable interpretation of Supreme Court precedent or an unreasonable assessment of the facts.

## IV. MERITS REVIEW

### A. Legal Standard

The provisions of the Antiterrorism and Effective Death Penalty Act, Pub.L. 104-132, 110 Stat. 1214 (AEDPA) govern the scope of this Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). *Renico v. Lett*, 130 S.Ct. 1855, 1862 (2010)(footnote omitted) .

When the claims presented in a habeas corpus petition have been presented to and decided by the state courts, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. §2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding

In applying this statute, the Supreme Court has held that "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002). To obtain habeas corpus relief, a Petitioner must show the state court's decision was "so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon*, 132 S.Ct. 26, 27 (2011), *quoting Harrington v. Richter*, 562 U.S. ----, ----, 131 S.Ct. 770, 786–87 (2011). This bar is "difficult to meet" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S.Ct. at 786 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)). In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.*, *quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

In situations such as this where the state courts have not adjudicated the merits of a claim, a federal habeas court should review a Petitioner's claim de novo. *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005) ("Where the state court has not addressed or resolved claims based on federal law, most courts, including this one, have held that the decision is not an 'adjudication on the merits.' Thus, a federal habeas court reviews such unaddressed claims de novo."); *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir.2003) (reviewing habeas Petitioner's sufficiency-of-the-evidence claim de novo where the state courts had considered the admissibility of the evidence but not the sufficiency of the evidence); *Pennington v. Jones*, 2006 WL 322474, at *2 (E.D.Mich. Feb. 10, 2006) (unpublished) (reviewing habeas Petitioner's claim de novo where he raised it for the first time in his petition).

Questions of state law are not reviewable in a federal habeas action. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law. Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (citations and internal quotation marks omitted). Petitioner instead must show that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Estelle*, 502 U.S. at 68 ("In conducting habeas

-24-

review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Accordingly, the Sixth Circuit has held that "[e]rrors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir.1994).

## B.  GROUNDS ONE,  TWO, SIX AND EIGHT

Petitioner presents three grounds for relief attacking various trial court evidentiary rulings and claims that these rulings violated his right to present a complete defense.  All of these claims relate to the trial court's exclusion of extrinsic or impeachment evidence which Petitioner contends was necessary to refute the testimony of two of the state's primary witnesses, Mr.Koulian, Petitioner's alleged victim, and Mr.Safaryan, the alleged victim of Petitioner's co-defendant .  For example, in his first ground Petitioner claims that the trial court erred by refusing to allow testimony from former law enforcement officials regarding a task force criminal investigation .  According to Petitioner, this testimony would have rebutted assertions by Mr. Safaryan that Mr. Safaryan was an upstanding community leader who did not engage in illicit activity.  Defense counsel made a proffer of this proposed testimony on the record.  Tr. Vol IV pp. 186-190.  Further, in his second ground, Petitioner contends that the trial court erred in excluding the admission of an investigative report from a task force initiated in 1999 or 2000 which Petitioner asserts would have demonstrated Mr. Safaryan's involvement in illicit business activities.  Significant discussion surrounding this report was had on the record following the direct examination of Mr. Safaryan.  Tr. Vol I, pp. 82-105.  Additionally, in his sixth and eighth grounds (which appear to be the exact same ground), Petitioner claims that the trial court erred in refusing to permit him to put on extrinsic evidence regarding Mr. Koulian's motive for fleeing the country. Petitioner contends that the extrinsic evidence would have demonstrated that Mr.

-25-

Koulian fled the country because he was having financial problems, not because he had been threatened by Petitioner's family.  Specifically, Petitioner sought to introduce testimony from the attorney and property manager from Gahanna Creekside Investments, the company that leased Mr. Koulian space for his jewelry store.   Tr. Vol I, pp.  225-229.

Certainly, to the extent these claims address issues of state evidentiary law, they are not subject to collateral review.  "Habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994).   Consequently, the Court's review is limited to whether Petitioner can demonstrate a violation of his federal constitutional rights.  *Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir. 2007).  Here, Petitioner has sought to elevate his claims to a constitutional level by contending that the trial court's evidentiary rulings outlined above violated his right to present a complete defense.

The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  This right ensures a defendant's opportunity to present witnesses in his defense.  *See Taylor v. Illinois*, 484 U.S. 400, 409 (1988). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor*, 484 U.S. at 410; *Rockwell v. Yukins*, 341 F.3d 507 (6th Cir.2003). The Supreme Court has made it clear that the right to present a "complete" defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions.  *Rockwell*, at 512.

Criminal defendants "must comply with established rules of procedure and evidence designed to assure fairness and reliability in the ascertainment of guilt and innocence." *United States v. Cruse*, 59 Fed. Appx. 72, 79 (6th Cir. 2003), *quoting Chambers v. Mississippi,* 410 U.S. 284, 302(1973). The application of "[s]uch rules do[es] not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *Cruse*, 59 Fed. Appx. at

-26-

79–80. Whether a decision to exclude certain evidence or preclude questioning about a particular matter violates a criminal defendant's constitutional right to present a defense turns on the extent to which that evidence is so highly relevant that it becomes indispensable to the success of the defense. *Crane*, 476 U.S. at 69. Against such considerations courts must balance the state's interests in enforcing the evidentiary rule on which the exclusion was based. The question for the Court to consider is whether Petitioner was afforded 'a meaningful opportunity to present a complete defense.' " *Crane*, 476 U.S. at 690, *quoting California v. Trombetta*, 467 U.S. 479, 485 (1984).

As the United States Supreme Court has recognized, "[o]nly rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 133 S.Ct. 1990, 1992 (2013). Cases in which the Supreme Court has declared the exclusion of evidence unconstitutional found that the exclusion "significantly undermined fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 317 (1998).

The Tenth District Court of Appeals did not address any of these claims as a violation of Petitioner's right to present a complete defense. Rather, the appellate court analyzed Petitioner's claims as appealing the trial court's evidentiary rulings. This is so even though, with respect to Claims One and Two, Petitioner cited federal law and argued the issue in terms of various constitutional rights. With respect to claims Six and Eight, Petitioner's assignment of error before the state appellate court was phrased in terms of the Sixth and Fourteenth Amendments but his argument did not directly address these principles. In analyzing Petitioner's first ground, the appellate court relied on Ohio Rule of Evidence 403 and found that the trial court was within its discretion to exclude the testimony from various law enforcement officers as to Mr. Safaryan's alleged criminal activity to avoid conducting a "trial within a trial" as well as to avoid confusion and delay. Similarly, with respect to Petitioner's second ground, the appellate court found that the trial court had not abused its discretion under Rule 403 in excluding a nearly ten-year-old investigatory report. Finally, the appellate court found

the trial court properly exercised its discretion in excluding testimony on behalf of Gahanna Creekside Investments regarding Mr. Koulian under Rule 403 on grounds of confusion.

Because the state court did not review the merits of Petitioner's constitutional claims, AEDPA deference does not apply and this Court is required to conduct a de novo review of questions of law and clear error review of factual determinations. *Couturier v. Vasbinder*, 385 Fed.Appx. 509, 516 (6th Cir. 2010); *see also Ambrose v Booker*, 684 F.3d 638 (6th Cir. 2012).

With respect to his first and second claims, Petitioner contended on appeal that both the testimony of former law enforcement officers and a criminal investigation report were necessary to rebut the testimony of Mr. Safaryan that he never engaged in criminal activity.  As Petitioner portrays it, at trial the prosecution "touted" Mr. Safaryan's business accomplishments, including his receipt of a governor's award.

In reviewing the record, the Court concludes that the prosecution did not devote much time to Mr. Safaryan's business accomplishments in direct examination.  Rather, the prosecution asked a handful of questions about his accomplishments as background information and only elicited testimony about a governor's award in response to defense counsel's questioning on cross-examination.  *See* Tr. Vol I, pp. 38, 115.  Further, on cross-examination, defense counsel was able to raise the specter of his involvement in illicit activities by questioning Mr. Safaryan as to whether he had any involvement in auto theft or flipping or falsifying VIN tags.  *See* Tr. Vol. I, p. 111.

With respect to Petitioner's sixth and eighth grounds regarding the exclusion of extrinsic evidence of Mr. Koulian's motives for fleeing the country, Petitioner sought to call the attorney and property manager for Gahanna Creekside Investments, the management company leasing the space for Mr. Koulian's jewelry store.  On appeal, Petitioner contended that this testimony would have revealed that Mr. Koulian's business was in financial distress and would have refuted Mr. Koulian's testimony that he had no contact with anyone in Columbus.  While this testimony was not allowed,

Mr. Koulian was cross-examined as to whether he portrayed his business entity as a limited liability corporation rather than a sole proprietorship, whether he was behind in rental payments prior to leaving the country, and whether his father removed any inventory from the store after Mr. Koulian left Columbus. Tr. Vol. I, pp. 198, 203, 204-207.

Taking all above into account, the trial court's rulings did not violate Petitioner's constitutional rights or deny him a fair trial. Petitioner had a meaningful opportunity to present a defense and the Court is not persuaded that any of this extrinsic evidence would have added to or refuted the testimony already in the record in any significant way. Rather, as the trial court found, all of this evidence had the potential to create confusion and delay by shifting the jury's attention to collateral issues unrelated to the events of the incident on May 17, 2008.

Moreover, the exclusions of this extrinsic evidence were harmless under the strict standard applicable in federal habeas cases. *See Fleming v. Metrish*, 556 F.3d 520, 536-37 (6th Cir. 2009) (right to present a defense is subject to a harmless error analysis). On federal habeas review, the harmless-error standard is whether the violation "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Habeas courts must apply this standard regardless of the harmless-error standard applied by the state court or whether the state court undertook harmless error review at all. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007). As explained above, defense counsel was afforded the opportunity to cross-examine Mr. Safaryan and Mr. Koulian in such as way as to raise issues regarding their credibility and the prosecution made only limited references to Mr. Safaryan's accomplishments. As a result, the exclusion of this evidence cannot be found to have had substantial and injurious effect or influence on the jury's verdict. Consequently, Petitioner is not entitled to habeas relief on these grounds.

## C. GROUND THREE

Petitioner's third claim relates to the investigative report which formed the basis

-29-

of his second claim. As Petitioner raises this claim here, his opportunity to proved that the prosecution violated its duties under *Brady v. Maryland*, 373 U.S. 83 (1963), was violated when the trial court quashed the subpoena for the non-confidential report of the criminal investigation which would have rebutted the State's characterizations of Mr. Safaryan's good character. This claim was raised on direct appeal as follows:

The trial court improperly quashed Appellant's subpoena of a non-confidential criminal investigation that rebutted the State's characterizations of an alleged victim's good character, thereby violating the Due Process clause of the Fourteenth Amendment and comparable provisions of the Ohio Constitution.

Petitioner's argument in his state appellate brief is set forth in its entirety as follows:

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution require the prosecuting attorney to disclose all evidence that is "favorable" to the accused and "material" to issues of guilt or punishment. *Brady v. Maryland* (1963), 373 U.S. 83, 87; *United States v. Agurs* (1976), 427 U.S. 97; *State v. Johnson* (1988), 39 Ohio St.3d 48. Crim R. 16(A)(1)(f) sets forth similar mandates.

As to the first requirement under *Brady*, the term "favorable" is defined broadly. Many forms of evidence qualify as exculpatory or "favorable." The Supreme Court has recognized that *Brady* encompasses evidence and information that may be used to impeach prosecution witnesses. *Giglio v. United States* (1972), 405 U.S. 150, 154-55 (holding that promises for favorable treatment and plea agreements must be disclosed); *see also United States v. Bagley* (1985), 473 U.S. 667, 682 (holding that impeachment evidence as well as exculpatory evidence is subject to disclosure and no distinction should be made with respect to the constitutional disclosure mandates). Favorable evidence also includes information that may not be favorable as it stands alone, but constitutes the "tip of the iceberg" and would lead to additional favorable evidence: "The duty of disclosure under *Brady* extend[s] not only to the [prosecution's] knowledge of concrete exculpatory information, but also to facts from which other exculpatory information could be inferred, i.e.,facts which could constitute the 'tip of the iceberg' of other *Brady* evidence." *United States v. Burnside* (N.D. Ill. 1993), 824 F.Supp. 1215, 1258

-30-

(quoting *United States v. Shaffer* (9th Cir. 1986), 789 F.2d 682, 690-91)).

　　　　With respect to the second requirement under *Brady*, evidence is "material" is there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley* (1985), 473 U.S. 667, 682. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 682. Materiality is not affected by the fact that evidence is arguably cumulative: "the fact that other impeachment evidence was available to defense counsel does not render additional impeachment evidence immaterial." *United States v. Smith* (1996), 77 F.3d 511, 515 (rejecting prosecuting attorney's argument that additional impeachment evidence was immaterial and cumulative due to existence of other impeachment evidence).

　　　　Defense counsel suspected the existence of *Brady* material for months. The documents sought by the subpoena were information sought by defense counsel for months. The State continuously told counsel and the court these documents did not exist. (Tr. Trn. Vo., I, Pg. 89-90). Through independent investigation and a subpoena, the defense found this exculpatory information but was denied access to it. Even if this information were not itself admissible in court, it was the "tip of the iceberg" information recognized in *Burnside*. These documents may have led to impeachment material. Therefore, the evidence should have been disclosed under *Brady*.

Petitioner seems to have rephrased his claim slightly for purposes of his habeas petition, tweaking it to suggest not that a *Brady* violation occurred, but that the trial court foreclosed his opportunity to demonstrate that such a violation occurred. Despite Petitioner's characterization here that he was prevented from proving a *Brady* violation, both the trial court and the state appellate court evaluated the investigative report under the *Brady* standard and independently concluded, based on a review of the material contained in the report, that no such violation occurred.

As set forth in great detail by the state appellate court in *State v. Ambartsoumov*, 2010 WL 5385439 (Franklin Co. App. December 21, 2010), adopted by reference in Petitioner's case, the trial court addressed the issue of the disclosure of the report as

-31-

follows:

> By way of background, on August 24, 2009, shortly prior to the start of trial, the trial court addressed a motion to compel discovery and/or exculpatory evidence filed by counsel for appellant. Counsel argued that several of the state's witnesses "are heavily steeped in criminal activity, including Nercessian who was in prison.". (Tr. Vol. I, 8). Counsel for co-defendant Veliev joined in the motion. In response, the prosecution argued there was no "[Brady] information" regarding Safaryan, Nercessian or Koulian (Tr. Vol. I, 10). Also on that date, counsel for appellant filed a subpoena with the Organized Crime Investigations Commission Task Force (via the office of the Ohio Attorney General)

> The next morning, August 25, 2009, the trial court addressed the filing of the subpoena, at which time counsel for co-defendant Veliev joined in appellant's subpoena motion. The court informed the parties: "The state's lawyers have advised me that the office of the attorney general wants to move to quash the subpoena on the argument that it is confidential, investigative material, and that the prosecuting attorney of Franklin County does not have access to this material.". (Tr. Vol.1, 14.)

> Following the start of trial, the trial court, outside the presence of the jurors, again addressed the issue of the subpoenaed documents. The prosecutor noted on the record "After speaking with some people, it seems as though the documents that have been requested are not confidential, as this was a closed case." "(Tr. Vol. I, 86). The trial court questioned Jerry Maloon, an assistant attorney general, who had conducted a search for the requested documents. Maloon had located several old administrative files, but stated that the task force "has been over for at least five years."and that "[t]he vast majority -- I'm going to say 99.99 percent of any and all documentation having to do with this task force of Organized Crime has been destroyed per our record retention policies." (Tr. Vol. I, 87-88) Maloon noted that, pursuant to a document dated October 12, 1999, a task force had been initiated in 2000.

> Maloon searched for the names in the subpoena (Safaryan, Koulian, and Nercessian) and stated that "Nercessian is the subject of a Dispatch article, January 17th, 2003, talking about a drug ring, and it looks like he got 30 months' incarceration at the federal level for that." (Tr. Vol. I, 88-89.) Maloon also found "the proposal from the CPD detective *** that was dated October 12th, 1999." (Tr. Vol. I, 89) Maloon requested that the trial

court conduct an in camera review of the documents, stating: "There is a great deal of sensitive information in the proposal." (Tr. Vol. I, 89)  Maloon further represented: In my review of that material *** [t]here's not one shred of evidence in there as to Ty*** Safyran's criminal conduct.  It's just not there.  I know what they're looking for." (TR. Vol. I, 100.)

The trial court conducted an in camera review of the documents. Following its review, the court noted that the documents included a photocopy of an article from the Columbus Dispatch, dated January 17, 2003, entitled 'Drug Ring Operated at Club,'that appears to reflect a conviction in the federal district court, and Mr Nercessian is reflected in this article as, quote, who is in jail and is  expected to plead guilty to his role in the ring next month, unquote" (Tr. Vol. I, 90-91.)  The trial court indicated it would allow defense counsel to have a copy of that article.

The trial court noted that the "other document that I've been provided *** is entitled summary investigation in to Russian émigré criminal activity in the Columbus area prepared October 12, 1999, and then there's what I understand from counsel to be a Columbus Police officer listed as the author." (Tr. Vol. I, 91)  The court related that the document contained various unnumbered pages, of which the following subheadings are included:  Auto thefts, insurance frauds, body shop frauds, odometer frauds, title frauds, other frauds, tax fraud.  Exceptions, drug trafficking, prostitution, organized crime connections." (Tr. Vol , 91)  The court indicated that the document also included a "two-page list entitled Índividuals Involved'with some phone numbers and purported information about their employment.  There look to be 20 or so individuals listed" (Tr. Vol. 1, 92)  Further, the document included "four pages of *** businesses involved." (Tr. Vol. I. 92).  The last pages of the document included a USA Today newspaper article dated August 24, 1999, as well as a 1998 U.S. News and World Report cover story.  "Dirty Diamonds.  How the FBI and some honest Moscow cops broke up a ring that was looting tons of gold and gems from the Russian National Treasury" (Tr. Vol. I, 92)

The trial court concluded:  I do not believe that under [*Brady*] that any of this material is subject to being turned over" (Tr. Vol. I, 93.)  The trial court made clear it was providing some of the information, and that "the only thing I'm not giving you is the summary of investigation by police officers 10 years ago." (Tr. Vol. I, 95)  Defense counsel argued, however, that the investigative report should be turned over to refute Safaryan's suggestion

that he was a legitimate businessman. The trial court noted that the issue of admissibility was "really a 403 issue for "me," and "that it's terribly prejudicial and confuses the issues and does not have any focus on what we're here to talk about." (Tr. Vol. I, 96) The court reiterated its view that the documents did not contain "[*Brady*] material." (Tr. Vol. I, 99).

When addressing the issue of a *Brady* violation as raised by Petitioner on appeal,

the state appellate court stated as follows:

 Appellant further argues that the trial court's ruling may have prevented the defense from obtaining *Brady* material. Appellant contends that the court's ruling resulted in prejudice because (1) the documents may have been useful as a tool to refute Safaryan's characterizations as a legitimate businessman, and (2) the documents may have been the "tip of the iceberg"for other relevant and exculpatory evidence.

In general, R.C. `149.43 establishes "a statutory right of access to public records and the procedure for exercising that right." *State v. Lawson*, 11th Dist. No. 2001-L-071, 2002-Ohio-5605, 30. Pursuant to that statute, a "public record does not include confidential law enforcement investigatory records.'" *Id*. quoting R.C. 149.43 (A)(1)(h).

The state argues that the materials at issue were not withheld by the prosecution, and that the trial court never specifically reached a determination whether of not the records were confidential; rather, the trial court conducted an independent review of the records and determined that some of the information in the records was not admissible, and that the records contained no *Brady* material. The record supports the state's contention that the trial court did not make a determination as to confidentiality of the documents under R.C. 149.43 but, instead, the court reviewed the materials in camera and concluded they did not contain *Brady* material and were not relevant to the issues before the jury.

There are three components to a *Brady* violation. "[T]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching, that evidence must have been suppressed by the State, either willfully or inadvertently, and prejudice must have ensued. *Strickler v. Greene* (1999), 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948.

The sealed investigative task force report which the trial court reviewed is

part of the record before this court, and we have reviewed that record to determine whether there is any support for appellant's assertion that a *Brady* error may have occurred as a result of the failure to provide that information. Having conducted our own independent review of the report, we are satisfied that there is nothing contained in that report which would have altered the jury verdicts, nor do we find error with the trial court's determination that the report did not contain material required to be disclosed under *Brady*. *State v. Lawson* (June 4, 1990 ), 12 Dist. No. CA88-05-044 (appellate court's own review of sealed materials found no violation of *Brady* rule and no materials that could have affected outcome of trial.

To the extent that Petitioner raises a *Brady* claim, as the state courts explained, there are three essential components of a *Brady* violation: (1) evidence at issue must be favorable to the accused because it is exculpatory or impeaching; (2) evidence must have been willfully or inadvertently suppressed by the State; and (3) prejudice ensued. *See Strickler v. Greene*, 527 U.S. 263, 282–83 (1999). The duty to disclose information under the *Brady* rule encompasses both exculpatory and impeachment evidence. *See id.*, 527 U.S. at 280; *U.S. v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995); *United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir.1994). Impeachment evidence is that which is favorable to the accused and "if disclosed and used effectively, [ ] may make the difference between conviction and acquittal." *Bagley*, 473 U.S. at 67. *See also United States v. Presser*, 844 F.2d 1275, 1278 (6th Cir.1988). "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 *quoting Bagley*, 473 U.S. 682.

The information at issue here was not exculpatory in the sense that it demonstrated Petitioner's innocence. Rather, defense counsel sought the report to impeach the credibility of Mr. Safaryan. While this information was sealed and made part of the state court record, this sealed information is not part of the record before this Court. Although the Court has requested that the record be supplemented to include this sealed information, Respondent has been unable to locate it. However, the state

-35-

court record does contain a fairly thorough explanation of the information contained in
the investigative report.

Significantly, Petitioner has not demonstrated the materiality of the information
contained in the report.  That is, Petitioner has not shown a reasonable probability that
the result of the trial would have been different had the trial court provided Petitioner
access to the complete report.  As set forth above, the state appellate court noted that the
age of the report and the failure of the report to result in any charges against Mr.
Safaryan supported its exclusion under state evidentiary rules.  Further, the testimony
of the custodian of the report indicated that Mr. Safaryan was not a subject of the
investigation report.  Additionally, as explained above in connection with Petitioner's
other claims, Petitioner's counsel was able to cross-examine Mr. Sarafyan regarding his
alleged involvement in illicit activities.

Moreover, Petitioner's suggestion that his access to the report could have led to
the discovery of *Brady* material is nothing more than speculation.  "Allegations that are
purely speculative cannot support a *Brady* claim."  *Stockman v. Berghuis*, 2013 WL
6885121, *11 (E.D. Mich. Dec. 31, 2013) *citing Burns v. Lafler*, 328 F.Supp.2d 711, 724 (E.D.
Mich. 2004); *see also United States v. Driscoll*, 970 F.2d 1472, 1482 (6th Cir. 1992) *abrogated
on other grounds by Hampton v. United States,* 191 F.3d 695 (6th Cir. 1999).  Further, "a
federal court's conclusions that such inadmissible material would 'lead' to admissible,
exculpatory evidence cannot be based on 'speculation with slight support.'" *Wogenstahl
v. Mitchell*, 668 F.3d 307, 325, n. 3 (6th Cir. 2012) *quoting Wood v. Bartholomew*, 516 U.S. 1,
8 (1995).  For all of these reasons, Petitioner cannot succeed on any *Brady* claim because
he has not demonstrated the materiality of the information in the report or how he was
prejudiced by its alleged suppression.

To the extent that Petitioner, through his framing of his *Brady* claim here, is
trying to suggest a violation of his right to present a full defense, any such claim also
fails. As explained above in connection with his other claims, Petitioner had a
meaningful opportunity to present a defense and the Court is not persuaded that any

-36-

evidence regarding a ten-year old investigation not even directed to Mr. Safaryan would have refuted his testimony in any significant way.  Moreover, under a harmless error analysis, the exclusion of this evidence cannot be found to have had a substantial and injurious effect or influence on the jury's verdict.  Rather, as previously discussed, defense counsel was afforded the opportunity to cross-examine Mr. Safaryan in such a way as to raise issues regarding his credibility.  Consequently, Petitioner's third claim fails on its merits.

### D.  GROUND SEVEN

Petitioner's seventh claim is that his due process rights and his right to a fair trial were violated when his co-defendant's post arrest silence was used as substantive evidence against him at trial.  Specifically, Petitioner argues that the state's questioning of Officers Ewing and Graber elicited responses commenting on Petitioner's co-defendant's right to remain silent.

Officer Ewing testified, in relevant part, as follows:

Q.      ... So, officer, whenever – do you ride – you ride with the defendant to the hospital.  Does the defendant start speaking to you at any point:

A.      Oh, yes.

Q.      And what sort of – if you recall, what sort of things is the defendant saying?

A.      Again, he was very, very angry at people at the club, outside the club.   Again, he very much talked.  He was very much, you know, didn't – I, of course, didn't ask him any questions, basically because we're kind of taught not to do that. ...

Q.      Thank you.  Did he ever – did he ever explain how he hurt his hand?

A.      No, I asked him a number of times even.  You know, that's the first thing the medics asked.  That's the first thing that the nurses and doctors asked when they came in to the ER there at St. Ann's.  He could never explain how he cut –

On cross-examination, Officer Ewing testified:

Q.      So when [the prosecutor] was asking about did he tell you
        how he cut his thumb, she was asking you basically about
        what he didn't say or did say, correct?  In the ambulance,
        remember she asked about that, that whole line of questions
        about his thumb and did he say how it was cut?

A.      Oh, right.

Q.      So you weren't even asking him any questions about that?

A.      Oh, I asked him some questions.  I just mean that I did not –
        we're just told not to begin to interrogate people.  I mean I'm
        allowed to say if someone is bleeding on the scene and, you
        know, hey, how did that happen.

Q.      Right.

A.      You know, but things like that.  But ...

Q.      Were you asking him specifically how he cut his thumb?

A.      Yes, I asked him how – yes, I asked him a couple times, well,
        how did that happen, you know.  Because even again, the
        doctors, the nurses, the medics they all asked the same
        questions numerous times.

Q.      And he said I don't know?

A.      He could not give us an answer.  I don't know if he said "I
        don't know."

Q.      What did he say?

A.      He just didn't answer.  He just did not answer the question
        and went to a different subject and began, you know, talking
        in different directions, sir, is the best way I can explain.

Officer Graber testified:

Q.      Did he tell you anything about how he got that injury?

A.      No, he didn't talk about the specific injury itself.  He did
        make remarks about the altercation.

Q.      And what were those remarks?

A.      He stated that he was inside the club and was approached
        by two individuals.  And he felt disrespected.  And that they
        started verbally attacking him.

Q.       Let me back up.  This conversation that you were having,
        this was at the hospital?

A.      Yes.

Q.      And this is while you're waiting for doctors and nurses to
        treat the defendant?

A.      Right.

Q.      Were you asking him any questions about the incident at

-38-

> that time?
>
> A.     No, we didn't ask him any specific questions.  He just started talking while we were waiting.
>
> Q.     And how does your job differ from that of a detective?
>
> A.     Well, if we were doing an official interrogation, we would have read his Miranda Rights and proceeded in a more formal interview.

Following this testimony, Petitioner's counsel moved for a mistrial.  Counsel argued that the prosecutor's questioning regarding the injury to Petitioner's co-defendant's hand permitted the jury to hear that Petitioner's co-defendant offered no explanation.  Counsel contended that this bit of testimony raised the issue of "post-arrest silence."

The trial court denied the motion for a mistrial, concluding that Petitioner's co-defendant was not being subjected to interrogation such that any violation of *Doyle* or *Miranda* could have occurred.  On appeal, the Tenth District agreed that Petitioner's co-defendant had not been subject to a custodial interrogation regarding the circumstances of how he had been injured.

*Doyle*, relied upon by the state courts, establishes that a prosecutor may not comment on a defendant's post-arrest silence as substantive evidence of guilt for the crime.  *Doyle v. Ohio*, 426 U.S. 610, 619 (1976).  "[T]he use ... of [a defendant's] silence , at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Id*. at 619.  Doyle, however, applies only in the context of post-*Miranda* silence.  *U.S. v. Peyton*, 183 Fed.Appx. 539, 548 (6th Cir. 2006) citing *Fletcher v. Weir*, 455 U.S. 603, 607 (1982).  Where the record is silent with respect to whether a defendant received *Miranda* warnings, comments on a defendants' post-arrest silence do not violate due process.  *United States v. Christian*, 404 Fed.Appx. 989, 992-93 (6th Cir. 2010).  Here, the testimony suggests that, although he was in custody, Petitioner's co-defendant had not been given his *Miranda* warnings because neither officer believed they were engaged in a custodial interrogation.  Putting aside the issue of whether the officers' questioning satisfies the requirements of an interrogation (and

again, the lower courts concluded it did not), what is clear is that, assuming for this Court's purposes that it did,  the situation in which Petitioner's co-defendant found himself was post-arrest, pre-*Miranda*.  Consequently, this Court does not view the circumstances of this case as fitting squarely within the bounds of *Doyle*.

However, assuming as Petitioner contends, that his co-defendant's silence was used as substantive evidence against him, Petitioner is not entitled to habeas relief on this claim.  In this case, the state appellate court's decision to uphold Petitioner's conviction despite the use of his co-defendant's post-arrest, pre-*Miranda* silence as substantive evidence of guilt was not contrary to or an unreasonable application of clearly established federal law.  At the time of Petitioner's trial, the constitutionality of using a criminal defendant's post-arrest, pre-*Miranda* silence as substantive evidence had not been addressed by the United States Supreme Court and disagreement existed among the federal circuits.  *Hall v. Vasbinder*, 563 F.3d 222, 232 (6th Cir. 2009);  *Pearson v. Romanowski*, 2013 WL 6801162, at *7 (E.D. Mich. December 23, 2013).  Consequently, the state appellate court's decision to uphold Petitioner's conviction despite the alleged use of his co-defendant's post-arrest, pre-*Miranda* silence was not contrary to or an unreasonable application of clearly established federal law and Petitioner is not entitled to habeas relief.

Finally, even assuming that the testimony elicited from Officers Graber and Ewing relating to his co-defendant's silence impacted Petitioner's due process rights and right to a fair trial, he still is not entitled to relief.  For purposes of determining whether federal habeas relief must be granted to a state prisoner on the ground of federal constitutional error, the appropriate harmless error standard to apply is whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The Court finds that the isolated testimony, not referenced by the prosecutor in closing argument nor revisited during any other portion of the trial, did not have a substantial and injurious influence in determining the jury's verdict. Consequently, Petitioner is not

entitled to habeas relief on his seventh claim.

### E. GROUND NINE

Petitioner's ninth ground for relief is that he was denied the effective assistance of appellate counsel when his counsel failed to raise a number of issues on direct appeal.   "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686,(1984). The court in *Strickland* announced the now familiar two-prong test to determine if there was ineffective assistance of counsel, which would result in reversible error:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable

*Strickland*, 466 U.S. at 687.

"Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance [ ... ]." *Id.* "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The United States Supreme Court has recently cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)." *Harrington*, ––– U.S. ––––, ––––, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2010). The Court observed that while " '[s]urmounting *Strickland*'s high bar is never an easy task [,]' ... [e]stablishing that a state court's application of Strickland

was unreasonable under § 2254(d) is all the more difficult." *Id.* (*quoting Padilla v. Kentucky*, ––– U.S. ––––, ––––, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010)). The Court instructed that the standards created under *Strickland* and § 2254(d) are both " 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Id. (citations omitted). Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

Claims of ineffective assistance of appellate counsel are governed by the *Strickland* analysis. *Haliym v. Mitchell*, 492 F.3d 680, 694 (6th Cir.2007). "In order to succeed on a claim of ineffective assistance of appellate counsel, a Petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000), *citing Strickland*, 466 U.S. 668; and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Counsels' failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir .2001), *cert. denied*, 535 U.S. 940 (2002). "Counsel's performance is strongly presumed to be effective." *McFarland*, 356 F.3d at 710, *quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir.2000), citing *Strickland*.

Petitioner identifies ten different issues which he claims counsel failed to raise on appeal in violation of *Strickland.* With respect to claims 1, 5, 6, 9, and 10, respondent argues that Petitioner was represented by the same attorney at trial and on direct appeal and that, under Ohio law, this counsel was not required, on appeal, to raise the issues regarding his own ineffective assistance at trial. Respondent argues that this precludes Petitioner from satisfying the first prong of the *Strickland* test because Petitioner cannot demonstrate that his appellate counsel's performance was deficient as it relates to these five claims. The Court agrees that Petitioner cannot satisfy the *Strickland* test but the

-42-

Court views respondent's argument as more appropriately directed to the issue of prejudice.

As a general matter, a defendant who is convicted in Ohio of a criminal offense has two avenues for attacking that conviction - direct appeal and collateral attack. Claims appearing on the face of the record must be raised on direct appeal, or they will be waived under Ohio's doctrine of res judicata. *See State v. Perry*, 10 Ohio St.2d 175 (1967). Issues which must be raised in a postconviction action pursuant to R.C. § 2953.21 include claims which do not appear on the face of the record and claims of ineffective assistance of trial counsel where the defendant was represented on direct appeal by the same attorney who represented him at trial. *State v. Cole*, 2 Ohio St.3d 112, 114 (1982). *See Van Hook v. Anderson*, 127 F.Supp.2d 899, 915 (S.D. Ohio 2001); *Jenkins v. Sheets*, 2009 WL 3151232, at*3 (S.D. Ohio 2009).

In light of this, Petitioner cannot claim that he was prejudiced by his appellate counsel's failure to raise issues on direct appeal relating to that same attorney's alleged shortcomings as trial counsel. Rather, under the circumstances of this case, the avenue of collateral attack through a postconviction petition was available to Petitioner to address the issues of his trial counsel's alleged deficiencies. Under this scenario, Petitioner cannot establish that a "reasonable probability" exists that the outcome of his direct appeal would have been different. Consequently, Petitioner will not be granted relief on grounds 1, 5, 6, 9 and 10 of his ineffective assistance of appellate counsel claim.

The second and third grounds for Petitioner's ineffective assistance of appellate counsel claim relate to the issue of testimony permitted over objection. The second ground asserts that appellate counsel should have raised the issue of trial court error in allowing the victim to testify over objection regarding why he was "cautious" of Petitioner's co-defendant. The third ground is that appellate counsel should have raised the issue of trial court error in allowing the victim's cousin to testify as to why the victim was "cautious" of the Petitioner's co-defendant.

In reviewing his postconviction petition, the Tenth District Court of Appeals

-43-

concluded that both sets of testimony were properly admissible under Ohio Evid. R. 404(B) because the testimony provided background information about the nature of the relationship between the victim and Petitioner's co-defendant and was proof of motive. Consequently, applying the *Strickland* standard, the state court concluded that Petitioner failed to demonstrate that his appellate counsel rendered ineffective assistance for failing to raise these issues on direct appeal.

The appellate court's decision was neither an unreasonable application of federal law nor based on an unreasonable determination of the facts. The state court determined that Petitioner's evidentiary claims were without merit. This Court is bound by the state court's interpretation of state law. *See Brooks v. Anderson*, 292 Fed. App'x. 431, 437-38 (6th Cir. 2008) ("this Court has held that federal habeas courts must defer to a state court's interpretation of its own rules of evidence and procedure when assessing a habeas petition. It stands to reason that this is true even when the Petitioner is not seeking habeas relief on the state court evidentiary determination at issue.") (citations and internal quotation marks omitted). *See also Adams v. Smith*, 280 F.Supp.2d 704, 721 (E.D.Mich. 2003) (deferring to the state court's evidentiary determination that contested testimony was not hearsay in rejecting a claim of ineffective assistance of counsel for failure to object to the alleged hearsay). Accordingly, because Petitioner's evidentiary claims are without merit, the Ohio Court of Appeals reasonably determined that appellate counsel was not ineffective for failing to raise the claims on appeal. *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008); *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003). Petitioner is therefore not entitled to habeas relief based on the ineffective assistance of appellate counsel relating to these claims.

Petitioner's fourth basis for his ineffective assistance of appellate counsel claim is that appellate counsel should have raised the issue of the trial court's error in using the wrong standard in deciding the discoverability of materials sought by the defense under Crim. R. 16. As this claim was raised in his postconviction petition, Petitioner argues that the trial court improperly applied the *Brady* standard to determine whether

-44-

the subpoenaed report was discoverable when the trial court should have considered only whether the information sought was favorable and material either to guilt or punishment.  *See Motion to Dismiss, Exhibit 22.*

In addressing this issue in Petitioner's postconviction petition, the state appellate court held that similar arguments were raised and rejected on direct appeal.  Further, the appellate court noted that it had, on direct appeal, reviewed the sealed record and determined that there was no evidence of a *Brady* violation nor any information which would have altered the jury's verdict.  Consequently, the appellate court concluded that Petitioner could not demonstrate prejudice under *Strickland.*

In reviewing the record, the Court notes that not only did the trial court evaluated the under *Brady*, but it also concluded that the report was "not material to the issues in this case," was not "germane" and would not "be a basis for legitimate cross examination of any witness in this case."  Tr. Vol. I pp. 93-99.  The appellate court agreed.  Because the appellate court acknowledged the breadth of the trial court's decision and upheld it on direct appeal, no reasonable probability exists that the result of the appeal would have been different.  Consequently, Petitioner has not established that the appellate court's decision involved an unreasonable application of *Strickland*.

Petitioner's seventh basis for his ineffective assistance of appellate counsel claim is that appellate counsel should have raised the issue of the trial court's error in overruling the defense motion for a continuance in order to subpoena Mr. Safaryan to question him about statements made to emergency room personnel.  Respondent argues that the trial court reasonably determined a continuance was not necessary because defense counsel had the relevant medical report and could have cross-examined Mr. Safaryan as to it during the State's case in chief.

In addressing Petitioner's postconviction petition, the state appellate court held that this issue hinged upon the validity of admissibility of various statements the victim had made which the trial court had barred.  The state appellate court determined that the trial court had not erred in barring the statements and, therefore, there was no

-45-

probability of success had this issue been raised on appeal. The appellate court also noted that the trial court had the discretion to bar the admission of these statements as hearsay and that there was no evidence of inconsistency in the statements.  A "denial of a continuance rises to the level of a constitutional violation only when there is an unreasoning and arbitrary insistence upon expeditiousness in the face of [a] justifiable request for delay." *Burton v. Renico*, 391 F.3d 764, 772 (6th Cir. 2004).  Here, Petitioner has not demonstrated that the trial court's denial of a continuance was unreasonable given its evidentiary rulings that the statements were prejudicial.  Again, Petitioner has failed to demonstrate that the state appellate court's determination that Petitioner had not demonstrated prejudice is not contrary to or an unreasonable application of federal law.

Petitioner's eighth basis for his ineffective assistance of appellate counsel claim is that the trial court erred in refusing to allow the defense to play a video tape recording of his co-defendant's statement to the police.  As explained in the state appellate court's opinion addressing this issue as raised in Petitioner's postconviction petition, Petitioner sought to introduce the interview to rebut that state's evidence that Petitioner's co-defendant did not explain to the police how his co-defendant received the cut to his hand.  Here, respondent argues, among other things, that Petitioner is not entitled to habeas relief because defense counsel was able to refute any suggestion that Petitioner's co-defendant was not forthcoming about the cut to his hand when questioning his co-defendant on direct examination.

A review of the transcript reveals the following testimony by Petitioner's co-defendant on direct examination:

Q.    And did you talk to [Detective Siniff]  freely and answer all his questions?
A.    Yes, yes.
Q.    Not a single question did you not answer, right?
 A.    I answered every question he asked me.
Q.    He asked you how you cut your finger, didn't he?
A.    Yes.
Q.    And you told him, didn't you?

-46-

A.      Yes.

...

Q.      Did he ask you how you hurt your finger?

A.      Yes, sir, he did.

Q.      And you had nothing to hide, correct?

A.      No, I didn't.

Q.      And did you explain to him the whole incident in detail?

A.      Yes, sir, I did.

Tr. Vol. IV, pp. 77-78.

The state appellate court, in addressing this issue in the postconviction proceeding, noted with approval the various evidentiary grounds on which the trial court had excluded the interview tape.  However, the court also held, relying on the testimony quoted above, that Petitioner was unable to demonstrate that the outcome of the trial would have been different had the tape been allowed to be played.   As the appellate court found, Petitioner's co-defendant testified about his interview and stated that he answered every question including the questions about how his co-defendant had cut his hand.    This Court agrees that, based on the co-defendant's own testimony set forth above, the outcome of the trial would not have been any different had the interview tape been played.  Consequently, the Court finds that this ground for relief lacks merit.

For the foregoing reasons, the Court **RECOMMENDS** that the petition for a writ of habeas corpus be **DISMISSED**.

## V.  THE MOTION FOR LEAVE TO AMEND

The proposed tenth ground for relief states as follows

Eldar Z. Veliev was denied effective assistance of counsel when his counsel failed to investigate and present testimonial evidence that Alex Nercessian cut Arut Khoulian's neck and Armen Stepanyan cut Tigran Safaryan's arm.

This ground for relief was included in the original petition.  At the time of the filing of the original complaint, Petitioner's appeal relating to this ground was pending, making this claim unexhausted.  By order dated May 16, 2013, Petitioner was directed

-47-

to delete this unexhausted claim or this action would be dismissed without prejudice. On June 3, 2013, Petitioner filed an amended petition for a writ of habeas corpus which did not contain this claim. Petitioner has filed a supplemental state court appendix documenting his exhaustion of this proposed claim.

In response, respondent argues that the proposed amendment is futile. Respondent contends that the proposed amendment is barred by the statute of limitations, having been required to be filed by March 22, 2013. According to the respondent, the proposed amendment neither relates back to the first amendment nor is it subject to equitable tolling. Further, respondent asserts that the claim is procedurally defaulted and that Petitioner has failed to make an actual innocence showing to overcome his procedural default.

Petitioner has filed a one-page, eight-line reply. In this reply, Petitioner states that this claim was pending before this Court on March 22, 2013, and that it relates back to the filing of the original petition. Petitioner does not address the issue of procedural default.

## A. LEGAL STANDARD

Fed.R.Civ.P. 15(a)(2) states that when a party is required to seek leave of court in order to file an amended pleading, "[t]he court should freely give leave when justice so requires." The United States Court of Appeals for the Sixth Circuit has spoken extensively on this standard, relying upon the decisions of the United States Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962) and *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), decisions which give substantial meaning to the phrase "when justice so requires." In *Foman*, the Court indicated that the rule is to be interpreted liberally, and that in the absence of undue delay, bad faith, or dilatory motive on the part of the party proposing an amendment, leave should be granted. In *Zenith Radio Corp.*, the Court indicated that mere delay, of itself, is not a reason to deny leave to amend, but delay coupled with demonstrable prejudice either to the interests of the opposing party or of the Court can justify such denial.

-48-

Expanding upon these decisions, the Court of Appeals has noted that:

> [i]n determining what constitutes prejudice, the court considers whether the assertion of the new claim or defense would: require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from bringing a timely action in another jurisdiction.

*Phelps v. McClellan*, 30 F.3d 658, 662-63 (6th Cir. 1994) (citing *Tokio Marine & Fire Insurance Co. v. Employers Insurance of Wausau*, 786 F.2d 101, 103 (2d Cir. 1986)).  *See also Moore v. City of Paducah*, 790 F.2d 557 (6th Cir. 1986); *Tefft v. Seward*, 689 F.2d 637 (6th Cir. 1982).  Stated differently, deciding if any prejudice to the opposing party is "undue" requires the Court to focus on, among other things, whether an amendment at any stage of the litigation would make the case unduly complex and confusing, *see Duchon v. Cajon Co.*, 791 F.2d 43 (6th Cir. 1986) (per curiam), and to ask if the defending party would have conducted the defense in a substantially different manner had the amendment been tendered previously.  *General Electric Co. v. Sargent and Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990); *see also Davis v. Therm-O-Disc*, Inc., 791 F. Supp. 693 (N.D. Ohio 1992).

The Court of Appeals has also identified a number of additional factors which the District Court must take into account in determining whether to grant a motion for leave to file an amended pleading.  They include whether there has been a repeated failure to cure deficiencies in the pleading, and whether the amendment itself would be an exercise in futility.  *Robinson v. Michigan Consolidated Gas Co.*, 918 F.2d 579 (6th Cir.1990); *Head v. Jellico Housing Authority*, 870 F.2d 1117 (6th Cir.1989).  The Court may also consider whether the matters contained in the amended complaint could have been advanced previously so that the disposition of the case would not have been disrupted by a later, untimely amendment.  *Id.*

### B. PROCEDURAL DEFAULT

The standard for finding procedural default is the same as that set forth above in

connection with Petitioner's fourth and fifth claims.  The procedural history of
Petitioner's proposed claim is as follows.  On April 18, 2012, Petitioner filed a motion
for leave to file a delayed motion for a new trial, alleging he had discovered new
evidence indicating that several individuals, other than himself and his co-defendant,
had committed the offenses.  By entry dated September 12, 2012, the trial court denied
leave to file a delayed motion for new trial.  In denying this motion, the trial court
concluded that Petitioner had failed to prove by clear and convincing evidence that he
had been unavoidably delayed from discovering, within the 120-day time limit, the
evidence upon which he was relying in support of his motion.  The state appellate court
agreed by decision issued July 11, 2013.  In reaching its decision, the appellate court
stated:

{¶ 11} Crim.R. 33(B) states in part:

Motions for new trial on account of newly discovered evidence shall be
filed within one hundred twenty days after the day upon which the
verdict was rendered, or the decision of the court where trial by jury has
been waived. If it is made to appear by clear and convincing proof that the
defendant was unavoidably prevented from the discovery of the evidence
upon which he must rely, such motion shall be filed within seven days
from an order of the court finding that he was unavoidably prevented
from discovering the evidence within the one hundred twenty day period.

{¶ 12} Thus, "Crim.R. 33(B) provides a mechanism for allowing a new trial
motion based on newly discovered evidence to be reviewed by the trial
court beyond the prescribed one hundred twenty day time limit." *State v.
Shakoor*, 7th Dist. No. 10 MA 64, 2010–Ohio–6386, ¶ 16. A defendant is to
file a motion for leave, and must "show by clear and convincing proof that
he has been unavoidably prevented from discovering, within the one
hundred twenty day time limit, the evidence that he is relying on to
support his motion for new trial." Id. "[A] party is unavoidably prevented
from filing a motion for new trial if the party had no knowledge of the
existence of the ground supporting the motion for new trial and could not
have learned of the existence of that ground within the time prescribed for
filing the motion for new trial in the exercise of reasonable diligence."
*State v. Walden*, 19 Ohio App.3d 141, 145–46 (10th Dist.1984). Further,
"[m]ost courts * * * also require defendants to file a motion for leave

-50-

within a reasonable time after discovering the evidence." *State v. Peals*, 6th Dist. No. L–10–1035, 2010–Ohio–5893, ¶ 22, citing *State v. Grinnell*, 10th Dist. No. 09AP–1048, 2010–Ohio–3028.
...

{14} In order to prevail on a motion for new trial based upon newly discovered evidence, a defendant must show that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Petro*, 148 Ohio St. 505 (1947). However, a trial court "may not * * * 'consider the merits of the motion for a new trial until it makes a finding of unavoidable delay.' " *Peals* at ¶ 21, quoting *State v. Lanier*, 2d Dist. No.2009 CA 84, 2010–Ohio–2921, ¶ 17. Accordingly, " 'unless a trial court has granted a defendant leave to file a delayed motion for new trial, the motion for a new trial is not properly before the court.' " *Peals* at ¶ 21, quoting *State v. Clumm*, 4th Dist. No. 08CA32, 2010–Ohio–342, ¶ 26.

{¶ 15} As noted under the facts, appellants submitted the affidavits of three individuals who each averred that they were at the restaurant on the night of the incident and observed individuals other than Veliev and Ambartsoumov commit the offenses. Each of these witnesses stated they were afraid to come forward for fear of retaliation, and one of the witnesses stated that he told a police officer at the scene that he did not observe anything that night.

{¶ 16} Appellants also submitted the affidavit of Palmer, trial counsel for Veliev, in which Palmer stated he had reviewed the affidavits of Irina Stevens, Artur Melkumov, and Irina Melkumov, and that "[a]t no time" did these witnesses "tell me" they were outside the restaurant on May 17, 2008 during the incident, and that "[a]t no time did [they] tell me" their version of how the stabbings took place. Palmer averred that "[t]he first time I heard this information was when Ambartsoumov's present attorney provided me with the affidavit in 2012." The affidavit of Shamansky, trial counsel for Ambartsoumov, contained almost identical statements as those set forth in Palmer's affidavit.

{¶ 17} The affidavit of Veliev states that he had reviewed the affidavits of

-51-

Irina Stevens, Artur Melkumov, and Irina Melkumov and that "[a]t no time" did these witnesses "tell me" that they were outside the restaurant on the evening of May 17, 2008, and "[a]t no time" did they relate to him their version of the stabbings. According to Veliev, "[t]he first time I heard this information was when my present attorney told me about it in 2011." Ambartsoumov submitted an almost identically worded affidavit.

{¶ 18} The trial court found that appellants had not demonstrated, by clear and convincing evidence, that the defense was unavoidably prevented from discovering the evidence of these three witnesses. The trial judge, who presided over the 2009 trial of both appellants, noted that the crimes arose from a spontaneous knife fight between patrons of the restaurant, and that there were "[m]any people" in the vicinity of the restaurant that evening; thus, the police officers arriving at the scene "faced a challenging investigation, at night and in the rain, with a large number of potential witnesses."

{¶ 19} With respect to the affidavits submitted by the new witnesses, the trial court noted that all three witnesses indicated in their affidavits that they recognized both Veliev and Ambartsoumov before the stabbings; however, "[n]one of the three witness affidavits explain when these witnesses first came forward, or to whom," and thus "[w]e are left to guess how, when and why they lost their professed fear of reprisal." The court further noted that, while the affidavit of Ambartsoumov indicates he learned of the "professed change of heart" of these witnesses in 2011, "[n]one of the witnesses explain if they contacted him in 2011, or set out any other facts about how they came forward," nor do these witnesses "say, one way or the other, whether they were interviewed by the original trial lawyers (or their investigators) before trial in 2009."

{¶ 20} In denying appellants' amended motion for leave to file a delayed motion for new trial, the trial court held in relevant part:

Clear and convincing evidence has not been presented that the defense was unavoidably prevented from discovering the evidence of these three witnesses. No one disputes that these three were present at the scene of the crimes. Apparently, no one disputes that they were known to the defense and even listed among a number of potential witnesses on the state's witness disclosure. Yet, the affidavits provided by defense counsel[ ] do not refer to their contact, or lack of contact with these people. Trial counsel vigorously defended this case. They are in the best position to

supply evidence that they did not know of the witnesses if that were true. They are in the best position to say now whether they, or an investigator working for them, met with each of the three witnesses before trial. They could tell us whether the witnesses told them a different story, or simply refused affirmative requests to meet for an interview. There is no such information provided. No suggestion comes from either attorney Palmer or attorney Shamansky that any of the three of them hid, or placed themselves beyond the range of a reasonable investigation by the defense, much less beyond the Subpoena power. That being true, no clear and convincing evidence has been presented that the defense was "unavoidably prevented" from using the three witnesses back in 2009.

It merits mention that unlike most single-defendant cases this trial had two co-defendants with privately retained counsel. Both mounted a spirited, coordinated defense. In most respects their efforts appeared closely aligned, and both defendants potentially would have profited if the evidence tendered now had been heard. In such a situation, there is even more reason to expect something more than has been obliquely suggested here in the lawyers' affidavits. The court is entitled to learn more about their joint investigation of witnesses together with their joint trial preparation and strategy when faced with a motion like this one. The court is asked to accept that they missed three potentially helpful witnesses which, given the court's familiarity with the work of defense counsel on these two cases, simply seems implausible. Both defendants were similarly motivated to leave no good lead unexplored. As the court recalls, both men remained out on bond through trial and might themselves have assisted counsel. So, simply alleging years later—without true backup evidence submitted under oath—that defense counsel utterly failed to follow up with these alleged eye witnesses is not readily to be accepted. The "clear and convincing" standard demands more.

(Footnote omitted.)

{¶ 21} Upon review, we agree with the trial court that appellants have not shown, by clear and convincing evidence, that they were unavoidably prevented from discovering, within the 120–day time limit, the evidence they are relying upon to support their motions. With respect to the three new witnesses, the state argued before the trial court that these witnesses were on the state's witness list and known to the defense at the time of trial and that most of the witnesses were interviewed by police.

{¶ 22} In *State v. Wilson*, 10th Dist. No. 93AP–732 (Nov. 2, 1993), this court

affirmed the trial court's dismissal of a defendant's motion for new trial in a case in which the defendant and several potential witnesses knew each other prior to trial. As to one of the witnesses, this court noted that the record contained no evidence of how this individual's potential as a witness, "however minimal, was ultimately discovered." As to a second witness, this court noted that the statement of this witness was "truly newly discovered evidence," and could not have been discovered within 120 days of the trial, but the record failed to indicate "whether or not anyone attempted to interview" him prior to trial. In holding that the defense failed to present clear and convincing proof that defendant was unavoidably prevented from discovering the evidence at issue, this court observed that "[i]f counsel, for whatever reason, cannot effectively communicate with the potential witnesses or cannot devote sufficient time to investigate personally, then the services of a private investigator can be retained." Other Ohio courts have similarly held that a defendant was not "unavoidably prevented from discovering the evidence" where the witnesses were known to the defense prior to trial. *See, e.g., State v. Saban*, 8th Dist. No. 73647 (Mar. 18, 1999); *State v. Nicholson*, 8th Dist. No. 70916 (May 1, 1997).

{¶ 23} Federal case law establishes that "if a defendant is aware of the evidence at the time of trial, then it is not newly discovered evidence under Rule 33." *United States v. Sims*, 72 Fed.Appx. 249, 252 (6th Cir.2003). Further, "where a witness who has indicated to the defendant * * * an unwillingness to testify truthfully at trial * * * but later supplies an affidavit exonerating the defendant of the offense, the affidavit is merely newly available evidence, but it is not newly discovered evidence." (Emphasis sic.) Id. Thus, "a post-trial affidavit exonerating the defendant that was provided by a witness who could have been called at trial, but was not, can never be considered newly discovered evidence under Rule 33." *Id.*, citing *United States v. Turns*, 198 F.3d 584 (6th Cir. 2000).

{¶ 24} In the present case, the affidavits of all three witnesses indicate they knew both Ambartsoumov and Veliev at the time of the incident. According to the affidavit of Irina Stevens, she was seated at the same table with appellants on the night of the events at issue. The trial court noted no apparent dispute that these individuals were "known to the defense and even listed among a number of potential witnesses on the state's witness disclosure." The affidavit of one of the witnesses, Artur Melkumov, indicates he spoke with police during the investigation on the night of the incident. Further, it is clear from the trial testimony that Irina

Stevens was known at the time of trial. Specifically, one of the trial witnesses, Dimitri Zubrick, testified that his girlfriend, Irina Stevens, went to the restaurant with him. According to Zubrick's testimony, his girlfriend Stevens "was never outside." (Tr. 153.) Zubrick also noted at trial that he spoke with a defense investigator prior to trial.

{¶ 25} Ohio courts have held that affidavits filed outside of the 120–day time limit of Crim.R. 33 that fail to offer a sufficient explanation as to why evidence could not have been obtained sooner are inadequate to show that the movant was unavoidably prevented from obtaining the evidence within the prescribed time. Shakoor at ¶ 21. *See also State v. Golden*, 10th Dist. No. 09AP–1004, 2010–Ohio–4438, ¶ 19 (where appellant failed to explain the investigative actions taken or why he was unavoidably prevented from discovering potential witnesses, trial court did not abuse its discretion in determining appellant failed to demonstrate by clear and convincing proof that he was unavoidably prevented from discovering the witness or her statement within the time limitation of Crim.R. 33(B)); *State v. Dawson*, 9th Dist. No. 19179 (July 14, 1999) (noting, in case affirming trial court's denial of leave to file motion for new trial, that affidavits submitted failed to give specific timeline of defendant's attempts to gain exculpatory testimony or provide any reason why defendant could not have discovered the evidence before the 120–day period had elapsed); *State v. Wilson*, 7th Dist. No. 11 MA 92, 2012–Ohio–1505, ¶ 57 ("the affidavits and the motion for leave do not contain enough information to conclude that Wilson was unavoidably prevented from discovering the evidence within the prescribed period").
...

{¶ 30} Appellants in this case bore the burden of establishing, by clear and convincing evidence, that they were unavoidably prevented from discovering these witnesses earlier. *Nicholson*. We agree with the trial court that appellants have not shown, through the affidavits submitted, that the new witnesses were unknown or "placed beyond the range of a reasonable investigation by the defense, much less beyond the Subpoena power." Upon review, appellants failed to prove by clear and convincing evidence that they were unavoidably prevented from discovering, within the prescribed time period, the evidence they are relying on to support their motions. Accordingly, the trial court did not abuse its discretion in denying appellants' amended motions for leave to file a delayed motion for new trial.

*State v. Ambartsoumov* , 2013 WL 3488186  (Ohio App. 10 Dist. July 11,2013).

Based on the above, there is no question that Petitioner failed to comply with a state procedural rule. Further, as set forth at length by the state appellate court, the state court enforced the procedural sanction. Consequently, the Court finds the first two parts of the *Maupin* test to be satisfied. Third, the untimeliness of a motion for a new trial is an adequate and independent state ground on which the state may rely to foreclose habeas review. *See Minor v. Warden, Lebanon Correctional Inst.*, 2014 WL 1276582, *14 (S.D. Ohio March 27, 2014). Because Petitioner has not addressed the issue of procedural default, he has not made any showing of either cause to excuse the default or actual prejudice. Similarly, Petitioner has not come forward with any evidence demonstrating his actual innocence. Consequently, it will be recommended that the motion for leave to amend be denied on grounds of procedural default of the proposed claim.

## VI. RECOMMENDED DISPOSITION

For the foregoing reasons, the Court **RECOMMENDS** that the petition for a writ of habeas corpus be **DISMISSED**. Further, the Court recommends that the motion for leave to amend be denied.

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review

the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


                                     /s/ Terence P. Kemp
                                     United States Magistrate Judge